UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DAMON STEPP,                        )
                                    )
            Plaintiff,              )
                                    )
      v.                            )      No. 1:17-cv-00644-SEB-DLP
                                    )
COVANCE CENTRAL LABORATORY          )
SERVICES INC.,                      )
                                    )
            Defendant.              )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment

[Docket No. 65], filed on November 2, 2017. Plaintiff Damon Stepp brought this lawsuit

against his former employer, Defendant Covance Central Laboratory Services, Inc.

("Covance"), alleging that Covance discriminated against him based on his race (African-

American) and sex (male) and retaliated against him for engaging in protected activity,

all in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. For the

reasons detailed below, we <u>GRANT</u> Defendant's Motion for Summary Judgment.

**<u>Factual Background</u>**[1]


***Background on Defendant's Business Operations***

---

[1] Mr. Stepp's briefing contains a number of factual assertions unsupported by any citation to the
record or admissible evidence in violation of Local Rule 56-1(e) and thus we have not included
them in our factual recitation.

Covance operates a facility in Indianapolis, Indiana, that manufactures clinical test kits in its Kit Production Department. Covance hires Kit Production Assistants whose duties include building kit boxes, packing the kits with certain clinical items, and preparing the kits for distribution. The Kit Production Department functions like an assembly line, in that Kit Production Assistants assemble portions of the kits at different workstations. These workstations include, *inter alia*, Popular Pick, Replenishment, Pick Kit Assembly ("PKA"), Pack, Advanced Pack, and Deep Catalog. Covance trains Kit Production Assistance in various workstations, as business needs dictate, and employees are required to successfully complete the training in a particular workstation before they can be assigned to work in that area.

Covance also employs Work Flow Leads, who are responsible for assigning Kit Production Assistants to the different workstations along the assembly line and coordinating the completion of daily work assignments. Work Flow Leads are also responsible for training the Kit Production Assistants and ensuring that Kit Production Assistants can complete their duties in the workstations they are assigned. Work Flow Leads do not have hiring and firing authority over the Kit Production Assistants, nor do they have the power to discipline Kit Production Assistants or to affect their hours and pay. Kit Production Assistants and Work Flow Leads both work under Supervisors.

Based on its business needs, Covance hires both temporary and permanent Kit Production Assistants. Because the volume of work fluctuates, which complicates staffing needs, when hiring temporary Kit Production Assistants Covance schedules their employment to end within one year of their start date. As business needs dictate,

Covance offers temporary Kit Production Assistants permanent positions; temporary employees also may apply for permanent employment when open positions are available. Mr. Stepp alleges that he was never told that his position was guaranteed for only one year, nor was he informed that he needed to apply for permanent Kit Production Department positions as they became available in order to be hired on permanently.

### *Plaintiff's Hiring as a Temporary Employee*

On December 7, 2015, Covance hired Mr. Stepp as a temporary Kit Production Assistant in the Kit Production Department. Because Covance hired Mr. Stepp as a temporary employee, his employment was scheduled to end in December 2016, one year after his start date. During the majority of his employment with Covance, Mr. Stepp received job assignments from Work Flow Lead David Casteel. For the first two months he was employed, Work Flow Lead Josh Dunlap gave him his assignments. Both Mr. Stepp and Mr. Casteel were supervised at all relevant times by Shawn Horning.

### *Plaintiff's Employment-Related Complaints*

Approximately two months after he was hired by Covance, Mr. Stepp mailed an employment-related complaint to Senior Employee Relations Manager Brenda J. Sisson, which alleged that race and gender bias in "company policy, terms and conditions of employment, and above all training" was negatively affecting African-American males. Exh. B. to Stepp Dep. (emphasis omitted). Specifically, Mr. Stepp alleged that Covance discriminated between white male and African-American male employees in determining which employees to offer permanent positions; that African-American employees were scrutinized and reprimanded more harshly for things like taking bathroom breaks,

chatting with co-workers, using cellular telephones on the job, and chewing tobacco; and that female and white male employees received better training opportunities which led to more desirable workstation assignments in Quality Control, PKA, and Pick. Mr. Stepp based his complaint on "his observations and the discussions [he] had with other Covance employees." Stepp. Dep. at 75–76.

On March 3, 2016, Mr. Stepp emailed Ms. Sisson a second employment-related complaint, reiterating many of the same concerns he had raised in his February 2016 complaint, including unequal training and discipline. As with his previous complaint, Mr. Stepp indicated that the basis of his allegations was his personal observations and his conversations with other Covance employees.

Mr. Stepp acknowledged in his March 2016 complaint that "management" had begun "to take action" on some of the issues he had raised, particularly with regard to training, but that "things are still nowhere close to being equal." Exh. D to Stepp Dep. He stated that he believed some of the training policies were designed to keep African-Americans, particularly African-American men, from advancing in various positions in the Kit Production Department, which had a direct effect on their pay and wages. He noted that Covance had no African-Americans in management positions in the Kit Production Department.

Mr. Stepp also alleged that he had been coerced by Mr. Casteel, his Work Flow Lead, into signing training verification paperwork stating that he had received adequate training in the PKA workstation, despite having received only 28 to 36 hours of training over a few days, when the training program in that area is supposed to involve 80 hours

of training over two weeks.  Finally, Mr. Stepp complained that, during the night shift on February 23–24, 2016, the Supervisor (who was new) approached Mr. Stepp, thanked him for working overtime, and "patted/slapped [him] on the mid-section of [his] back." *Id.*  The Supervisor repeated the gesture a second time during the shift while instructing Mr. Stepp "how to work the Error Lane."  *Id.*  Mr. Stepp reported that he "felt both threatened and intimidated by these pats on [his] back because they were absolutely unnecessary" and that he "felt very disrespected by it."  *Id.*

***Defendant's Investigation of Plaintiff's Complaints***

Covance initiated an investigation into Mr. Stepp's allegations of race and sex discrimination.  Ms. Sisson interviewed several employees in the Kit Production Department, inquiring whether any of them had witnessed race or sex discrimination with respect to Covance's policy enforcement, training, job assignments, or hiring.  According to Mr. Stepp, none of the employees she interviewed were African-American.  Ms. Sisson also reviewed the disciplinary records of employees in the Kit Production Department for inconsistencies based on race or sex, examined employee training records to determine whether there was evidence that African-American males were receiving inadequate training opportunities, surveyed whether workstations were assigned in a discriminatory fashion, and analyzed Covance's hiring date to determine if race or sex impacted its hiring decisions.

Ms. Sisson concluded upon completion of her investigation that there was no evidence to support Mr. Stepp's claims of race and sex discrimination in the Kit Production Department.  On May 2, 2016, Ms. Sisson emailed Mr. Stepp a four-page

report detailing her investigation and setting forth the reasons she reached that conclusion. In the email, Ms. Sisson noted that Mr. Stepp had indicated his interest in being selected for a management or supervisory position and recommended that he speak with his direct supervisor "about a career path and development plan to assist with your growth." Exh. H to Stepp Dep.

### Plaintiff's Other Internal Complaints

Mr. Stepp alleges that he made additional employment-related complaints to Covance between March 2016 and November 2016, but testified that he could not recall more precisely when he made those complaints, the details of those complaints, or whether he followed the company's complaint procedure in submitting them. Although he could not recall specifics, Mr. Stepp acknowledged that those complaints were focused on the same types of issues he had raised in his previous complaints, to wit, that Covance engaged in race and gender bias with respect to its policy enforcement, training, job assignments, and hiring decisions. Mr. Stepp testified that he did remember reporting his observation that female employees violated company policies with impunity, including arriving late to work, using profanity, and wearing shorts on the job without receiving discipline. As with his previous complaints, Mr. Stepp based his allegations of discrimination on his own observations and discussions with co-workers.

### Plaintiff Receives a Verbal Warning

Covance issued to Mr. Stepp a documented verbal warning dated July 6, 2016 for wearing headphones while in training, a violation of company policy. However, the document was not given to Mr. Stepp until July 18, 2016, the date on which both Mr.

Stepp and Mr. Horning signed the document acknowledging that it had been received by Mr. Stepp. The warning related to his use of headphones while in training on April 28, June 29, and July 2, 2016. When asked about the incidents during his deposition, Mr. Stepp could not recall whether he had been asked to remove his headphones on April 28 and June 29, but acknowledged that he often had headphones either on or around his ears and that Mr. Casteel had asked him to remove them during training on July 2, 2016. Neither his pay nor his hours were impacted by the verbal warning he received.

### Plaintiff's EEOC Charges

Mr. Stepp filed three charges with the Equal Employment Opportunity Commission ("EEOC") during his employment with Covance, alleging that the company was engaging in race and sex discrimination. Mr. Stepp filed his first charge on July 7, 2016, his second charge on September 8, 2016, and his third charge on September 17, 2016. Ms. Sisson averred that Covance did not inform Mr. Casteel about Mr. Stepp's charges. Mr. Stepp testified that he had told Mr. Casteel at one point that he "would consider maybe filing an external complaint," but could not recall whether he actually ever told Mr. Casteel after he filed the EEOC charge that he did in fact submit an external complaint. Stepp Dep. at 116–17.

### Plaintiff Reported for Insubordinate Behavior

On November 3, 2016, Mr. Casteel reported to Supervisor Linda Ball that Mr. Stepp had engaged in insubordinate behavior that made Casteel feel uncomfortable. Specifically, Mr. Casteel reported that on multiple occasions, Mr. Stepp had shaken his head, grinned, laughed, and said "uh oh," whenever Mr. Casteel walked by him. Mr.

Casteel told Ms. Ball that he believed Mr. Stepp's behavior was insubordinate and threatening.

After receiving this report, Ms. Ball discussed the issue with Mr. Stepp and requested that he stop this behavior because it upset Mr. Casteel. Mr. Stepp admitted in his deposition testimony that he had behaved as Mr. Casteel described and that he continued to act in the same manner around Mr. Casteel after Ms. Ball had spoken with him, but that he did not intend for his behavior to be threatening or intimidating. Stepp Dep. at 256–58.

On November 4, 2016, Ms. Ball received an email from another Covance employee, Nicole Carter, who reported that Mr. Stepp had engaged in similar behavior around her. According to Ms. Carter, Mr. Stepp would stare at her during work without breaking eye contact, shake his head at her when she entered or exited the facility on a daily basis and then write something down in his notebook, and that this behavior made her feel "super uncomfortable." Exh. 2 to Ball Aff.

### Hiring Freeze Implemented by Defendant

In early November 2016, Covance's executive management team advised Senior Human Resources Partner Gary Grubb that, because the volume of work in the Kit Production Department had been declining, the company was implementing a hiring freeze. Mr. Grubb was instructed that, because of the hiring freeze, Covance could no longer offer temporary employees in the Kit Production Department permanent employment at the one-year mark of their employment.

Upon receiving these instructions, Mr. Grubb identified several employees who were approaching the one-year mark with the company, including Mr. Stepp. According to Covance, the hiring freeze impacted all Kit Production Department employees who reached their one-year mark of employment in November 2016, December 2016, or January 2017. Mr. Grubb did not want these employees to be terminated abruptly, particularly during the holiday season, so he originally extended the impacted employees' employment for an additional ninety days beyond the expiration of their one-year employment term.

Ms. Ball met with Mr. Stepp in November 2016, shortly after this decision had been made, and informed him that, because of the hiring freeze, Covance could not hire him as a permanent employee, but that his employment would be extended for ninety days beyond the one-year anniversary of his start date. On January 17, 2017, Mr. Grubb met with Mr. Stepp to discuss his employment, reminding him that the hiring freeze prevented Covance from converting any temporary Kit Production Assistants to permanent employees. Mr. Grubb encouraged Mr. Stepp instead to apply for open positions. Although Mr. Stepp had been told that his employment would be extended for ninety days into March 2017, Covance ultimately terminated his employment on February 3, 2017 because management decided that the ninety-day extension offered by Mr. Grubb to Kit Production Department employees affected by the hiring freeze was too long and was unnecessary since the holidays had passed.

In addition to Mr. Stepp, six other temporary Kit Production employees were terminated during the hiring freeze. In November 2016, Covance terminated Blake

Lewis and Myron Burts.  Covance terminated Elizabeth Killea and Nicole Mack in December 2016.  In January 2017, Covance terminated Taisha Green and in February 2017, the company terminated Jacob Thompson as well as Mr. Stepp.  Like Mr. Stepp, Ms. Killea, Ms. Mack, and Ms. Green had all originally been told that they would receive ninety-day extensions of their employment beyond their respective one-year anniversaries, but then had their extensions shortened after Covance determined that ninety days was too long.  According to Covance, because these terminations were all due to the hiring freeze, it did not review performance metrics or disciplinary records when terminating these employees, including Mr. Stepp.

*Plaintiff's Applications for Open Positions*

On January 21, 2017, before his termination, Mr. Stepp applied for two positions with Covance outside the Kit Production Department.  Ultimately, Mr. Stepp was not offered either position.  First, he applied to be Covance's Learning and Change Management Coordinator.  According to Covance, he did not get hired for that position because he did not meet the minimum requirements.  Mr. Stepp also applied for a Sample Handling position.  An internal recruiter, Michelle Mangual, interviewed Mr. Stepp for the position via telephone on February 2, 2017, during which Mr. Stepp testified that he was "sleep talking."  Stepp Dep. at 187.  Following the interview, Ms. Mangual received an email from Mr. Stepp stating that he was asleep during the interview, thought he was "having a dream in regards to our phone conversation," and that any information he provided likely was "unreliable."  Exh. L to Stepp Dep.  Based on Mr. Stepp's interview

10

performance and subsequent email, Covance decided not to hire him for the Sample Handling Position.

***Other Temporary Employees Hired by Defendant Before and After Hiring Freeze***

Mr. Stepp alleges that Covance treated the following five female employees more favorably by extending them offers of permanent employment: Holly Weber (white); Ariel Coleman (bi-racial); Sarah Beatty (white); Henrietta Tenney (African-American); and Alexis Bournes (African-American). Ms. Weber began her temporary employment on October 5, 2015 and was offered a permanent position on May 2, 2016. She was supervised by Shawn Horning, who also supervised Mr. Stepp. Ms. Coleman began her temporary employment on February 1, 2016 and was supervised by Mr. Horning. Covance offered Ms. Coleman permanent employment on February 20, 2017 after she applied for an open Kit Production position. Mr. Stepp did not apply for the position she received. Ms. Beatty began her temporary employment on March 21, 2016 and was offered a permanent position on March 6, 2017. She was also supervised by Mr. Horning. Ms. Tenney began her temporary employment on November 11, 2015 and was offered permanent employment on August 8, 2016. Her supervisor was John Blackburn. Ms. Bournes began her temporary employment on November 16, 2015 and Covance offered her permanent employment on August 8, 2016. She was supervised by Josh Dunlap.

Mr. Stepp alleges that Covance also treated the following five white male employees more favorably by offering them permanent employment: Jacob Garcia, Matt Morse, Charles Morse, Richard Morse, and Brandon Durham. Mr. Garcia began his

temporary employment on May 26, 2015, and was offered permanent employment on December 14, 2015.  He was supervised by Mr. Horning.  Matt Morse began his temporary employment on June 29, 2015 and Covance offered him permanent employment on December 14, 2015.  His supervisor was Mr. Dunlap.  Charles Morse began his temporary employment on August 24, 2015 and was offered permanent employment on December 14, 2015.  He was supervised by Mr. Dunlap.  Richard Morse began his temporary employment on June 29, 2015 and was offered permanent employment on December 14, 2015.  He was also supervised by Mr. Dunlap.  Mr. Durham began his temporary employment on January 14, 2013 and was offered permanent employment on June 17, 2013.  His supervisor was Nathan Mahler.

### The Instant Litigation

Mr. Stepp filed his original complaint in this action on March 2, 2017 after having received his Notice of Right to Sue from the EEOC.  He subsequently amended his complaint on September 27, 2017, alleging that Covance discriminated and retaliated against him in violation of Title VII and § 1981.  Covance moved for summary judgment on November 2, 2017.  That motion is now fully briefed and ripe for ruling.

## Legal Background

### I.  Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the

nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## II.     Discussion

Mr. Stepp alleges that Covance discriminated against him and terminated him because of his sex and race and also in retaliation for engaging in protected activity, in violation of Title VII and § 1981.[2] An analysis of these claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765). Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765.

---

[2] It is well-established that "[t]he same standards governing liability under Title VII apply to § 1983 claims." *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511 (7th Cir. 1986).

## A.     Race and Sex Discrimination Claims

Mr. Stepp claims that Covance discriminated against him based on his sex and race by: (1) failing to provide him with adequate training; (2) assigning him to workstations that he did not prefer and that he contends affected his upward mobility in the company; (3) failing to discipline white and female employees for various policy violations; (4) falsely accusing him of intimidating and threatening conduct; and (5) failing to hire him as a permanent employee. The majority of these claims can be addressed in a fairly summary fashion as the only event of which he complains that rises to the level of being an adverse employment action is his claim that he was not hired into a permanent position because of his sex and race.

### 1.     Adverse Employment Action

For his discrimination claims to survive summary judgment, Mr. Stepp must show that he suffered an adverse employment action. *See Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) ("The requirement that a plaintiff show [he] suffered an adverse employment action as a result of [his] employer's alleged discrimination is an element of any Title VII claim …."). Although "adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (quotation marks and citation omitted). The definition of an adverse employment action "is generous," but "an employee must show some sort of quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Id.* at

1116–17 (quotation marks and citation omitted). The majority of Mr. Stepp's allegations do not rise to this level.

First, Mr. Stepp claims that he and other African-American males were denied adequate training and not trained in certain workstations. However, the evidence establishes that Mr. Stepp received sufficient training for him to successfully complete his job as he was meeting Covance's legitimate job expectations and was never disciplined for performance issues. Mr. Stepp also concedes that his hours and pay or job assignments never decreased due to a perceived lack of training. Although he contends that he was originally denied an opportunity to train in PKA, he admits that once he raised the issue with Covance, he was provided the training he sought. Moreover, there is no indication that training in any particular workstation would have entitled him to receive greater benefits. Because there is no evidence that Mr. Stepp was ever disciplined for, financially affected by, or otherwise had the terms and conditions of his employment materially impacted by his perceived lack of training, it does not rise to the level of an actionable discrimination claim.

Similarly, even if true, the fact that Mr. Casteel assigned Mr. Stepp to workstations that Mr. Stepp personally did not prefer and/or prevented him from switching workstations is not an adverse employment action absent evidence that such assignments involved lower pay or different hours or in some way adversely affected his advancement. *Kersting v. Wal-Mart Stores*, 250 F.3d 1109, 1119 n.2 (7th Cir. 2001). Mr. Stepp also contends Covance discriminated against him by failing to discipline white employees for violating Covance policies, including chewing tobacco, taking double

15

breaks, sleeping on the job, and wearing shorts. Even assuming that Covance did not

consistently discipline other employees for every policy violation, the fact that other

employees were not disciplined in no way establishes that *Mr. Stepp* was subjected to an

adverse action in the absence of evidence that *he* was disciplined for those same

violations. Mr. Stepp concedes he never engaged in any of these policy violations. The

only formal discipline Mr. Stepp received while employed by Covance was a

documented verbal warning for wearing headphones while in training. He speculates that

the warning "could be used against" him, but there is no evidence that his pay or his

hours were affected as a result of the documented verbal warning. Accordingly, this

verbal warning does not rise to the level of an adverse employment action  *See Oest v. Ill.

Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (oral or written reprimands do not

constitute adverse employment action in the absence of a tangible job consequence).

Mr. Stepp also alleges that Covance discriminated against him by falsely accusing

him of threatening and intimidating Mr. Casteel by shaking his head, smirking, and

saying "uh oh" whenever Mr. Casteel walked by him. There is no evidence, however,

that Mr. Stepp suffered an adverse employment action as a result of Mr. Casteel's

complaint. Ms. Ball discussed the conduct with Mr. Stepp and requested that he stop

engaging in such behavior, but did not discipline him because of the report. Mr. Stepp

claims that Ms. Ball later told him that the reason he was not being offered permanent

employment was because of Mr. Casteel's complaint, but beyond this inadmissible

hearsay, there is no evidence that either Ms. Ball or Mr. Casteel had any involvement in

the decision to implement the hiring freeze or the decision not to hire Mr. Stepp for a

permanent position with the company.  Mr. Stepp's speculation otherwise cannot defeat

summary judgment.  *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)

("It is well-settled that speculation may not be used to manufacture a genuine issue of

material fact.").

Because none of these events of which Mr. Stepp complains constitute adverse

employment actions, his discrimination claims based on these allegations cannot survive

summary judgment.

### 2.      Failure to Hire as Permanent Employee

Finally, Mr. Stepp alleges that Covance discriminated against him based on his sex

and race by not hiring him permanently.  Covance's failure to hire Mr. Stepp into a

permanent position clearly constitutes an adverse employment action.  Mr. Stepp's

discrimination claim fails, however, because, viewing the evidence as a whole, no

reasonable factfinder could conclude that he was not hired into a permanent position

because of his sex or race.

In support of his claim, Mr. Stepp points to a number of women and white males

who received offers of permanent employment from Covance while he did not.

However, the comparators Mr. Stepp has identified all had different start dates than he

and thus were on different one-year temporary employment tracks.  Additionally, all but

one of his purported comparators, many of whom had different supervisors, were

permanently hired months, or in some cases, years, prior to the hiring freeze that Covance

asserts is the non-discriminatory reason for his termination as well as the termination of

at least five other temporary employees.  In short, there is no evidence that Covance hired

any Kit Production Assistants during the hiring freeze. Mr. Stepp's alleged comparators, all of whom had different hiring dates and were offered permanent employment at times when there was no hiring freeze in place, are therefore not similarly situated such that the more favorable treatment they received can support an inference of discrimination.

Nor is there any other evidence, beyond Mr. Stepp's speculation, that raises doubts regarding the legitimacy of the department-wide hiring freeze that affected several other temporary employees hired at the same time as Mr. Stepp and who were on the same one-year employment track. There is no allegation that Mr. Grubb, the Covance employee who implemented the hiring freeze, harbored discriminatory animus toward Mr. Stepp or otherwise implemented the hiring freeze in a suspicious or inconsistent manner. Instead, Mr. Stepp speculates that Ms. Ball, Mr. Casteel, or members of the executive management team used Mr. Grubb as a cat's paw. There is simply no evidence beyond Mr. Stepp's speculation for this theory, however.[3]

### B.     Hostile Work Environment Claims

Mr. Stepp claims that Convance created a hostile work environment by falsely accusing him of making threats and intimidating Mr. Casteel. This claim cannot survive summary judgment, however, because Mr. Stepp cannot prove that this one incident is either sufficiently severe or pervasive enough to support a harassment claim. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("A recurring point in these

---

[3] Nor is there any indication that Mr. Stepp's failure to be hired for any other permanent position with Covance was discriminatory. He does not dispute that he was unqualified for one position for which he applied and that he "sleep talked" through the interview for another.

[hostile work environment] opinions is that … isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'") (internal citation omitted).  Although being falsely accused of improper motives[4] can undoubtedly be upsetting and hurtful, it is not sufficient, at least in the circumstances presented here where Mr. Stepp was not disciplined for the alleged conduct and did not suffer any other employment-related consequences,[5] that it created the "hellish" environment required to support a hostile work environment claim.  *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997) ("The workplace that is actionable is the one that is 'hellish.'") (quoting *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)).

## C.    Retaliation Claims

Mr. Stepp claims that Mr. Casteel retaliated against him for making internal discrimination claims by manipulating his job assignments, issuing him a verbal warning for wearing headphones, and making false accusations against him to Ms. Ball. However, to recover on a retaliation claim, a plaintiff must establish that he suffered an adverse employment action as a result of having engaged in statutorily protected activity. *Boston v. U.S. Steel Corp.*, 816 F.3d 455 (7th Cir. 2016).  As addressed above, because

---

[4] Mr. Stepp conceded in his deposition that he did engage in the conduct complained of by Mr. Casteel—shaking his head and saying, "uh oh"—but denies that he intended the behavior to be intimidating or threatening, as Mr. Casteel reported.

[5] As discussed in further detail above, although Mr. Stepp claims that Ms. Ball told him that Mr. Casteel's allegations were the reason he was terminated, there is no evidence beyond this inadmissible hearsay that either Ms. Ball or Mr. Casteel were in any way involved in the decision not to hire him into a permanent position.

Mr. Stepp's work performance, pay, and hours were not impacted as a result either of having his job assignments manipulated or of receiving a verbal warning, nor was he disciplined as a result of Mr. Casteel's report to Ms. Ball, we cannot find that these incidents rise to the level of adverse employment actions. Although Mr. Stepp claims that Ms. Ball told him that Mr. Casteel's report resulted in his termination, there is no indication that either Mr. Casteel or Ms. Ball had any involvement in the decision not to hire Mr. Stepp for a permanent position. Mr. Stepp's speculation otherwise is insufficient to defeat summary judgment. *See Abioye v. Sundstrand Corp.*, 164 F.3d 364 (7th Cir. 1998) ("[C]onjecture or speculation regarding the employer's motives cannot be used to defeat a summary judgment motion ….").

In his briefing Mr. Stepp for the first time argues that Covance's failure to hire him into a permanent position was in retaliation for his having engaged in protected activity. Mr. Stepp failed to include such an allegation in his complaint, however, and now, at the summary judgment stage, it is "'too late' to change so basic a factual premise in the case." *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 443 (7th Cir. 2008). Accordingly, Covance is entitled to summary judgment on Mr. Stepp's retaliation claims.

## III. Conclusion

For the reasons detailed above, Defendant's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: ___9/28/2018___

*Sarah Evans Barker*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

DAMON STEPP
336 S. Gale St.
Indianapolis, IN 46201

Jaclyn Susan Gessner
BARNES & THORNBURG LLP
jgessner@btlaw.com

J. Day Peake, III
PHELPS DUNBAR LLP
Day.Peake@Phelps.com

John E. Phillips
PHELPS DUNBAR LLP
john.phillips@phelps.com

Jason A. Pill
PHELPS DUNBAR LLP
jason.pill@phelps.com